Good morning, Your Honors. Dustin Marcello appearing for Mr. Sean Finn. If it may please the court, I was trial counsel and appellant. And what I want to talk about today, Your Honors, I'm going to split up my argument into two separate arguments. The first I'd like to address is the selective prosecution argument and reserve a few minutes towards the end for the issue related to the securities transactions that were involved in this case. Where I'd like to start is the case law seems pretty clear that the idea behind a selective prosecution argument is one based on equal protection that you have to show in a discriminatory purpose and intent. In this case, we presented two kind of generalized ideas of discriminatory purpose and intent. One was a generalized basis based on commentators and researchers who have shown a significant gender disparity in cases generally in the legal system. This would be kind of a... In this case, you were relying on three people who you said should have been, who you said weren't prosecuted. You held out three examples, right? Correct. So we presented the general evidence, but then we also showed specific evidence as it did to the... Suppose general evidence doesn't get you anywhere without showing the specifics for this case, right? Agreed. You have to show that somebody's similarly situated in many of the cases... So why don't you tell us who was similarly situated and how you showed that to the district court? Sure. The first was Cheryl Robinson. She was actually the exact same... But Ms. Robinson, she got 300. Your client got 830. How are they similarly situated? Well, I mean, you know, that's the extent of the harm, not whether or not a crime was committed or whether the person... No, but we're looking at similarly situated. She got 300 and she was interviewed by the authorities. I don't remember whether it was the FBI or not. And your client got 830. So how are they similarly situated for the purposes of prosecution? And your client was not interviewed by the FBI like she was. Correct. So the idea is how similarly situated do you have to be to show that there's a disparity between the two? I mean, is it $1, $10, $100, $1,000? That's not a distinct... This is three times, almost three times as much plus cooperation. Correct. And to the extent of the cooperation, it wasn't voluntarily cooperation. I mean, they did attempt to speak to Mr. Finn. Mr. Finn did initially cooperate with the SEC in part of their investigation before they issued a warrant while he was in Canada. But the second individual also is Myra Foster. She was involved in one transaction with Mr. Billingsley, right? Right. And then your client was involved in many more, correct? Right. And so then we'll get to the third one, which is Antoinette Harnstone. She was basically an escrow agent. Correct. But this entire alleged fraud, the way that it occurred, could not have occurred without her. So every transaction went through Ms. Harnstone's escrow service. The release of funds to allow everybody to get paid, including Mr. Finn, was through Ms. Harnstone's escrow service. The aura of it being a legitimate transaction was as a direct result of Antoinette Harnstone's escrow service. How much was her personal profit? I honestly don't know the exact amount that she received out of all of these. Because it's not in the record, right? Correct. Because she was never charged. All I can see is what monies went through the escrow, which is every dollar that's involved in this case went through her escrow. And she never recruited any investors, right? That's correct. And again, so what you have is you have each person having a significant overlapping amount of conduct with Mr. Finn, okay, in this specific case. And then, so then you have them being similarly situated as a whole, especially. So you have one person that dealt with, yeah, they may have dealt with less investors. You have somebody that pitched investments, maybe not to everybody, but to at least some of them. And then you have somebody that set up the transactions to allow all of this to occur at all and handle all of the money in the case. And between all three of them, not one of them received a single charge related to that conduct that is all the same conduct as a whole that's alleged against Mr. Finn. And here's probably the more important thing is one thing that was cited in the record that was in the judge's decision was related to whether or not you could show purposeful intent. And I guess the hard part of this is, you know, intent and purpose is in the mind of the person. We can't determine somebody's intent and purpose unless they perform some action or say something. I think it would be pretty rare to say we're going to prosecute these because they're men. You have to look at their actions. I'll tell you what the, I mean, maybe obvious by now, but my major problem with your argument is that we start out with the government has significant discretion and that sometimes there can be hard questions about similarly situated and not. But honestly, counsel, with the three people you mentioned to the district court, I personally don't see them as remotely similarly situated to your client. And so that's the problem that I have with this argument from the get-go. And again, you know, I guess that is part of the decision-making process. I mean, it is easy to dismiss the argument if you just say, hey, you know, is there any true Scotsman? I, you know, I don't know where you would draw the line of, of how similarly situated somebody has to be. I mean, do they have to have the same exact crime, the same amount of victims, the same amount of money and the same amount of cooperation towards the end? And I don't think that any of the case line, I mean, the Armstrong cases forwards, I mean, you had people just generally committing drug crimes or generally committing trafficking crimes, human trafficking crimes. It wasn't even anybody specific. And in this case, we have specific people that engaged in the same conduct involving the same victims involving the same thing. It may be not. And again, we're talking about to the extent, you know, and again, that may be a sentencing consideration or mitigating evidence, but not whether or not they committed the same crimes as Mr. Finn. And so, and then the final point is that... What evidence do you have that the government had an impermissible motive? So again, that's the whole, the whole crux of it is that we would very rarely find a direct evidence, an email or somebody saying, I'm going to do this because somebody's male or female or based on their gender. What we did have and what we did show specifically in this case is that Agent Tierney in his testimony, and the judge cited this in his order that's available, that Agent Tierney associated conduct that was committed by Ms. Robinson and Mr. Myra Foster to Mr. Finn. He essentially said that something that they had done was something that Mr. Finn had done in front of the grand jury. Now, again, you know, we can explain it away and we can say, oh, well, it was just, he just misspoke. But it may also be, and we never actually got to that point of that, because again, the judge felt the same way as he did, which is, hey, you didn't get past the first hurdle, which is to show discriminatory intent, and therefore we never got to it. But that was at least some evidence that fits along the idea of some of the Armstrong and Ford cases where you had individuals wearing t-shirts or sending postcards. So you had specific individuals, you have the general statistical evidence, and then you also have Agent Tierney associating conduct by Myra Foster and Cheryl Robinson to Mr. Finn specifically, to create the impression that he did those actions. And not the impression, he specifically said Mr. Finn did these actions when in fact it was actually Myra Foster and Cheryl Robinson who did those actions. So again, that seems to evidence both a selective enforcement or a selective prosecution of a purposeful intent to charge him. And again, the only individuals involved in this entire case who didn't get charged, I shouldn't say all of them, there was one other individual, a James Irwin, that didn't get charged. He was male as well. But the three individuals named here, none of them received charges. They were intricately associated with this case. They had overlapping conduct that was identical to Mr. Finn and only varied to the degree and extent, not to the criminality of the conduct itself. And so, you know, again, this more specific one was Agent Tierney's testimony in front of the grand jury. Does the mere fact that they weren't charged show impermissible motive? So the answer I would say is, again, we have to determine motive and intent based on actions that took place. And then you have to essentially infer intent from those actions. Because I don't know where you would ever end up in a situation, I guess theoretically you could have some situation where you get a recording of somebody saying that they're doing this for an impermissible motive. But I would say because it's intent and motive, which is in the mind of the person doing it, that these things, you know, would be unlikely to be determined from direct evidence. They have to be inferred from the actions that take place in not prosecuting. That's why these cases I'll ask you to look at, find similarly situated people, see if they were prosecuted, because that infers intent and purpose. And so, you know, in this case, I think that not charging those individuals infers the intent and purpose to be discriminatory. And I should note, in all of these cases, and I don't think, and again, this is why we cite statistical evidence and general evidence, it doesn't necessarily mean, and I don't think these cases imply, and for equal protection generally, that you're always conscious of your bias when you're doing. I mean, that's the whole, the insidious nature of what we call systemic problem is that you're not even aware you're doing it. It's just the effect of your actions results in it. And it's because of an inherent bias that you may not even know you're sharing. Yeah, I'm sorry to interrupt. May I ask you a question about your indictment argument? If the indictment largely tracks the statute and tracks the Ninth Circuit Model Jury Instruction, what else do you think is missing? Why is this an inadequate or insufficient indictment? So the indictment itself, I think what we were talking about was the notice requirement as it relates to the forfeiture and restitution amounts. But the main issue with the securities transaction is that, you know, I mean, this statute is written in the 30s. The statute is almost like two pages long that covers every single which way that you can structure a transaction. But the main idea that the main thing you pull from all the cases and all of the definitions is that it's a form over function type statute, meaning that we don't care what you call these things. We don't care how you do it. The main structure is that you have a difference between a debt transaction and an investment transaction. But your argument on appeal is that as a matter of law, the indictment was legally deficient and that it had to be dismissed by the district court. Your argument on appeal isn't that the facts weren't there. Your indictment, which, as Judge Koh said, tracks the statute, was still somehow legally sufficient so that as a matter of law, the district court needed to dismiss the indictment. So, and again, it was more related to the notice requirement of how they structured the statement in there as it relates to restitution. So, and again, I think that the statute itself, again, is a very broad statute. And I think that you have to essentially have it narrowed down to the type of transaction that are involved in your case. And so, really, what, and again, there is kind of an overlapping argument in the sense of, I now would agree, it is somewhat fact-dependent in the sense of at trial, you know, I was very careful to ask every single witness how they believe this transaction was taking place and how it always was taking place is I deposit money and I'm expecting to get a check for a larger sum of money so I can go do an investment. You know, you had somebody that was trying to conduct a business transaction to buy real estate. But somebody else... Counsel, your argument to the district court wasn't that the indictment didn't give you fair notice of what your clients were charged with, right? No. So, it didn't give them fair notice of what they were charged with as it relates to the specific transactions in this case. So, again... But you didn't ask for a bill of particulars, did you? That's correct. I did not. And so, I think that these things became apparent once the case was being argued throughout the trial. So, it was kind of a backwards-looking, basically saying, I think you're arguing this because you got a two-page statute of different types of and then all of a sudden now during the middle of trial, geez, you're arguing something totally different. I had no idea that that was even coming. That's the whole problem with notice is you don't know it until it's happening, right? You're at trial and now they're arguing something that you don't believe has ever been in the indictment or alleged or presented that way and now it's being presented at trial. So, you know, that's what I thought was the defect with with the indictment itself. But more specifically, and this is what I wanted to just spend a little bit of time on, is again, these transactions were set up as debt transactions. These were every single witness specifically said that they were going to take this money that they thought they were going to get from out to go do some other investment. Okay, that is the distinguishing difference between a securities and a debt. So, you go into a bank and you ask for money because you want to go do some investment. That is not a security. It doesn't matter if you sign a document. It doesn't matter what you do with it. It doesn't matter how it's structured. But counsel, I see nothing in your brief and you can point me to it if you think it's there where you have argued that the evidence here was insufficient to sustain the convictions. So, it's not that I'm arguing that it wasn't enough to sustain the convictions. What I'm pretrial motion on this that was denied, which is that legally these transactions were not securities. And that's it. And that the evidence at trial bore that out. Well, I'm sorry, counsel, as I understand your brief to us, you are appealing that the indictment is insufficient in describing these transactions as securities and whatever it is that in addition you may have that the evidence was insufficient to sustain the convictions. The argument I see in your brief was that the indictment itself as a matter of law was deficient. So, if I'm right about that, please point me to where in your brief you're making a different argument. No, but those are two different distinctions. So, in one sense, you're saying, okay, at trial, there was testimony. And in the indictment, they made these allegations. What I'm saying is, legally, these cannot be securities transactions. Legally, these cannot be on a legal basis. And therefore, the indictment is deficient because it's alleging that these are securities transactions without a basis for alleging that they're securities transactions. Again, they point to things like, hey, they use the terms investment contracts. They point to, you know, the indictment says that they engaged in certain conduct. But ultimately, as a legal basis and as a, you know, under the law, that these aren't securities, that these are debt transactions that are specifically exempted from the securities. Then, counsel, I think you made the wrong argument in your brief, although I don't think the argument you're now making would have gone very far. You may not be aware. I sat on the panel of your client's co-defendants, and there was an explicit argument to that effect, which our panel rejected. Specific argument as to? As to whether the particular contracts at issue were securities or not. And what I would say to distinguish that, and in those cases, the focus was on the title of documents, what was taking place. In our case, all of the testimony, and again, each witness was asked, you believed you were getting money from Malum, yes. And what were you planning to do with that money? Go and do some other thing on my own. Not that Malum was going to invest in anything or do anything. And so that's why it distinguishes this one, because we actually had the factual testimony that supported that these were debt transactions. Mr. Marcellino. And so, yes, sir. I just wanted to ask you, as time was running short, about your restitution argument. Yes. Tell me the strongest point on your restitution argument. The strongest crux, and again, this is more of a historical analysis, is that essentially you had restitution amounts that were associated with Mr. Finn that weren't associated with what he received out of the transaction. And so what we have is, I was very dismayed when I started doing the research on this, of the historical nature of how our restitution laws and overlapping fines and fees and how they all got opposed. But basically, the strongest argument is essentially that what we had is we had three separate amounts, one that was attributable to Mr. Finn's conduct, one that was associated with all the conduct in the case, and that we believe that the judge was improperly associated with all of the conduct in the case rather than the conduct that was associated or the benefit that Mr. Finn had received. But in that regard, counsel, you're taking issue with precedent that establishes that restitution can be joint in several and can basically be imposed on someone who is part of a scheme. Even though he didn't personally profit from the entire amount of the restitution, but your problem is with our precedent and not with really what the judge did here following that precedent, right? Well, as it relates to restitution, you're correct. But as it relates to forfeiture, that's where I think that it should be ultimately modified to the conduct that's associated to you. Because now you're asking to forfeit property that's not attributable to your conduct anymore. So that's how they overlap. But for forfeiture, wasn't there evidence that your client got 830? And am I incorrect? Wasn't that the amount of the forfeiture? The testimony was that the full transactions that went through was 893. The amount that got actually transferred to Finn was a lower amount that was approximately $465,000. I'd have to find the citation of that after this is done. But there was three amounts that we were arguing about over whether it was attributable. The full amount, the $892,000 or the $800,000, roughly $1,000, and then a $400,000 amount. Your time has expired, unless my colleagues have any more questions. But we'll give you some time for rebuttal. And we'll now hear from the government. Good morning, Your Honors, and may it please the Court. Andrew Lang for the United States. Sean Finn was convicted of wire and securities fraud because he played a central role in victims of Malum Group's high-yield investment fraud scheme. His various challenges to his convictions and his sentence are meritless and should be rejected. Unless the Court has a preference, I can start at the top with the selective prosecution argument. This particularly demanding standard requires Finn to show clear evidence of both discriminatory effect of the prosecutor's charging decisions and discriminatory purpose animating those decisions. Can we look to circumstantial evidence? Yes, Your Honor. There may... I mean, if you didn't charge any of the three women who were involved. Well, that's true, because they were not similarly situated. I think for the reasons... Well, Mr. Marcello makes the argument they were similarly situated. They just may have not asked for the same sum of money. Well, I think they were dissimilarly situated both because they played less significant roles and because... Incidentally, significance from the amount of money they were able to procure. That's part of it, Your Honor. But it's also because they played different roles. And with respect to Robinson, who arguably played the most similar role to Finn's as a quote-unquote broker for Malum, she cooperated. And that categorically makes someone dissimilarly situated. How about Hardcastle? I'm sorry? Oh, Hardstone. What? Hardstone. Hardstone, Your Honor? Yeah, Hardstone. Hardstone, although Finn characterizes her as the linchpin of the fraud in his brief, she was a functionary. She worked for the company that possessed the escrow account into which victims were directed to deposit their losses. But she didn't interact with the victims. She didn't recruit the victims. I believe the only testimony about her interaction, even indirectly with any of the victims, was from Fox, where Mr. Fox said he sent his lawyer to try to figure out what had happened to his money, and she refused to talk to him. Did she make any money? I don't know. I think she did from CES, but I don't know that it's in the record, Your Honor. So we can look at circumstantial evidence. So my point with respect to circumstantial evidence is, as I think Finn reasonably points out, there may not be a smoking gun showing discriminatory purpose. But there has to be clear evidence from which you can infer discriminatory purpose. So, for example, in the one case that I'm aware of in which this— What if Mr. Finn here didn't cooperate and speak with the FBI? Correct. Okay. Does the fact that one who doesn't speak gets charged, is that something that the court can look at? I think I would flip it around. I think the fact that someone cooperates with law enforcement, admits their culpability, even goes so far as to implicate others. So, for example, in Cheryl Robbins' 302, the report of her interview with the FBI, she stopped being involved with Malum around 2011, which is earlier than Finn. She implicated Brandel. She explained why she thinks other people were culpable, and she admitted her involvement. There was also some dispute over exactly how much she made. I believe she told the FBI she thought that it was only $125,000. Then at the hearing, which we include in the supplemental excerpts of record, Finn said he thought that it was $300,000. But either way, at most, it's just over a third of what Finn made. So because she cooperated, because she played a less significant role, she was dissimilarly situated to Finn, and that doesn't support the discriminatory effect argument that Finn is trying to make on appeal. That conclusion, if anything, is more clear with respect to Hardstone and Foster, which, as Judge Koh pointed out, was only involved at all in the scheme with respect to Billingsley. She seems to have been Billingsley's business partner, made the introduction to Finn, and then Finn ran the ball down the field from there. Second, with respect to discriminatory purpose, as Finn concedes, there is no direct evidence of discriminatory purpose, and there are no circumstances from which this Court could infer discriminatory purpose. So the case that I wanted to cite there was United States v. Steele, 461 F. 2nd 1148, which, again, I believe is the only case in which this Court has actually reversed based on a selective prosecution claim. There, the government only prosecuted people for refusing to fill out the census who had protested about the census, and there was no other conceivable reason this Court could find why those prosecutorial decisions could possibly have been made. So that's an example, Judge Fischer, of a case where I think it is fair to infer discriminatory purpose from other evidence, but that is incredibly different from the case before this Court. Unless there are other questions about selective prosecution, let me touch on the issue of securities fraud as alleged in the indictment. As Your Honors pointed out, the question is whether the indictment satisfied the pleading requirements of Rule 7, and it did. That's the argument that Finn is making, and as Your Honors pointed out, the indictment uses the language of this Court's modeled jury instructions. It uses the language of the statute. Where, I'm looking at the indictment. Where does it say that the alleged victims here had an expectation of profits produced by others? So looking, it says the defendants promoted high-yield investment programs, which the defendants represented to potential investors would pay large returns when they then and there well knew the investment programs that they promoted were fictitious. But it's not really clear. I mean, I would look later on the same page. The defendants provided investors with investment contracts titled joint venture agreements or financial services agreements and induced investors to part with money by promising that Malum Group would contribute its own money to profitable joint ventures with investors. I mean, does it really explicitly say that the victims would have expected profits produced by others? That's a fair question, Your Honor. I don't think the indictment was required to allege each of the three Warfield or Howey factors in providing a fulsome definition of an investment contract. What the indictment does is cite the securities fraud statutes. It uses the language of those statutes. And it also specifically states or alleges that the contracts were investment contracts. And as the district court correctly held, citing this Court's opinion in Morse, whether or not the evidence would ultimately show that the agreements were investment contracts under that tripartite definition was a question for a properly instructed jury. And the jury was so instructed. But I mean, in addition, from the language that Judge Koh read, it does specifically say by promising that Malum Group would contribute its own money to, quote, profitable joint ventures. So the word profitable is in the indictment, and it's in connection with a joint venture in which the investors are going to be participating, right? Yes, that's exactly right. So I think a fair reading of the indictment and certainly a fair reading of the trial evidence is that these were alleged to be and then proved to be investment contracts. But I mean, at its heart, the government's argument is we track the language of the statute. We track the language of the Ninth Circuit model jury instruction. And if we fail to prove our case, the defendant wins. Yes, that's right, Your Honor. If we if he were making a sufficiency of the evidence argument, we would be talking about the evidence at trial. And he referred to that a few minutes ago and referred to that offhandedly in his brief. But the argument I understand him to be making is, does the indictment comply with Rule 7? Does the indictment satisfy the pleading standard? And I think from the face of the indictment, the answer is yes. Unless there are other questions about the indictment, I do want to touch very briefly on the restitution and forfeiture arguments that my friend turned to at the end of his time. I think with respect to restitution, as Your Honor pointed out, his dispute is with this court's precedent. And with respect to forfeiture, his dispute is with the evidence in the record. Can I ask you with the whole $833,000, all of that was attributed to fraud? There wasn't any that was for, you know, legitimate salary? So it was all attributable to fraud. So the trial evidence, including Mr. Conger's testimony, the FBI forensic accountant, was that $833,000 was the total amount that Finn was paid by NY Consultants. So contrary to his argument on appeal, that is all money that he personally. NY Consultants didn't do any legitimate work? I think that's a fair inference from the record. So, for example, Billingsley testified that when he interacted with Brandel, he represented himself to be not just working for NY Consultants, but essentially to be a face of malum. It's also noteworthy that when Mittman personally went to visit the NY Consultants' office after her money disappeared, she found it to be abandoned. And there was other evidence that was submitted to the disreported sentencing, the lettered through NY Consultants from the victims to Finn. So yes, all of that was personal fraud. Did Mr. Finn offer any evidence as to whether the $490,000 and change that went to him personally or the $830,000 that went to NY was, in fact, for legitimate business purposes? I don't believe he did, Your Honor. And his argument before the district court, like his argument before this court, was only that that $830,000 figure wasn't the money that he personally received. So he made the same honeycut argument that he's making now before this court. And that argument is belied by the record, because he did, in fact, receive that full $830,000 total. What about Mr. Finn's argument, although he didn't argue it here before us, on the restitution question? He argues that restitution must be found by a jury. What about that argument under Apprendi? Well, that argument is contradicted by precedent. As this court has explained, Southern Union and Apprendi don't create an entitlement to a jury finding with respect to restitution. That argument has been made to the Supreme Court, I think, recently and repeatedly in cert petitions, which have always been denied. And as this court has held, there is no jury entitlement to restitution, notwithstanding Apprendi, Southern Union, and the other cases in that line. So again, I think with respect to several of his restitution and forfeiture-related arguments, Finn takes issue with binding precedent that this panel can't disturb. Unless the panel has other questions about these or any of the other issues, I think our position in our brief is very clear. And again, I ask this court to affirm the judgment of the district court in all respects. Thank you. Thank you. Thank you. Counsel, your time was exhausted, but we'll give you two minutes for rebuttal. Thank you so much, Your Honor. And the first thing I'd like to focus on, the securities transactions. Again, the court pointed out, and I think I misunderstood the question when you first asked it, they do have to show that these joint ventures were going to result in the profits of another person. The way these transactions all occurred is that there was a broker that had an investment idea with the victim who then went to Malum and said, hey, we need money for this investment idea. But it wasn't Malum's idea. In the indictment, they charged as if Malum had the idea to make this money, and they were all throwing money in it to go make money from another person. I think that is a portion of the securities transaction statute. So yes, you can cite the model jury instructions, but you also have to include the one that there was an expectation that the profits were going to be made from others in order for it to be a securities or for it to be a securities transaction. Lastly, or the only other focus I'd like to have, Cheryl Robinson, the government had said she made one third of what Finn made. Well, Finn made one third of what Martin Schlepler made. He made one third of what the people above him made. So I don't know where that line delineates that says that suddenly that she's no longer a part of it. And of course, she cooperated because she was the first one that was gone after. You know, Mr. Finn initially, like I said, originally was going to work with the SEC and then was charged. So I don't know if he was ever presented the same opportunity that Ms. Robinson was early on to be cooperating. I don't know if that would have been the deciding factor. Lastly, on the restitution, I would note there was a notice issue as well that we had raised in addition to the other issues, which was that the language of the restitution and the did not match up with the statutes that they had cited. And because of that, there was improper notice of the restitution in that, therefore, that no restitution should have been ordered in the case. And then finally, Mr. Conger had testified as to two amounts. Mr. Conger was the testimony that supported the restitution. One amount was the $400,000 and change and the other $800,000 amount. And again, we cite to his testimony on the day of trial of what was received by Mr. Finn. And then later it was it was changed to the $833,000. So thank you. I think we have your argument. We thank both counsel for their helpful arguments. This case is submitted. And with that, we are adjourned for the day.
judges: Fisher, BENNETT, KOH